Charles McGUIRE et al., Plaintiffs,

v.

The TIMES MIRROR COMPANY, etc., et al., Defendants.

No. CV 75–3612–AAH.

United States District Court,
C. D. California.

Dec. 8, 1975.

Law Office of G. Joseph Bertain, Jr. by Timothy H. Fine, San Francisco, Cal., and Simon & Sheridan by James J. Coyle and Donald B. Bachrach, Los Angeles, Cal., for plaintiffs.

Gibson, Dunn & Crutcher by John J. Hanson, and Donald L. Zachary, and William A. Niese, Los Angeles, Cal., for defendants.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW DENYING PRELIMINARY INJUNCTION

HAUK, District Judge.

Plaintiffs' motion for Preliminary Injunction came on for hearing on November 24, 1975. In support of their motion, plaintiffs filed over 600 pages of memoranda and affidavits while defendant the Times Mirror Company ("Times Mirror") filed 158 pages of memoranda and affidavits in opposition, as well as a 226 page Appendix devoted to the issue of the Fair Trade laws. In addition, plaintiffs took the depositions of Messrs. Nelson, Clarke and Tiffany, representatives of Times Mirror, on November 5, 6 and 7, 1975, and the transcripts of these depositions, totaling 390 pages, were filed by plaintiffs. At the hearing on their motion, plaintiffs requested the opportunity to present testimony which request was granted. Plaintiffs presented seven witnesses and several exhibits in support of their motion, while Times Mirror offered the testi-

mony of one witness in rebuttal. The testimony was presented over the period of one and one-half days. Plaintiffs presented several hours of oral argument, and Times Mirror argued in opposition. The transcript of the hearing covers approximately 425 pages.

Having considered all of the foregoing, and pursuant to Rule 52 of the Federal Rules of Civil Procedure and Rule 7 of the Rules of the Central District of California, the Court makes the following Findings of Fact and Conclusions of Law which respect to the motion of plaintiffs for a preliminary injunction.

## FINDINGS OF FACT

1. Plaintiffs are independent contractors engaged in the purchase, distribution and sale of the Los Angeles Times ("The Times") pursuant to the terms and conditions of written Dealer Agreements with defendant The Times Mirror Company. Plaintiff Charles McGuire, John S. Zinn, Wayne S. Stanford, Robert O. Ahlstrom, Gordon P. Palaro, Norbert A. Zytowski, Daniel Pawlowski, Steve Rajcic, Thomas D. Stoddard, Jr., Joseph Matranga, Warren Ropp, Jesse L. Tolton, Floyd W. McKinsey, Rudolph C. DeLuna, W. H. Hopkins, James C. Dennis, James N. Hopkins, Warren H. Churchill, Michael Maleta, Richard M. Williams, Robert C. Lewis, Kenneth Carrington, Richard Kramer, Melvin R. Stern, Richard Bishop, Thomas O. Schlotfeldt, Edward P. Palkovic and Norman E. Johannes are presently, and have been during the four years preceding the filing of the First Amended Complaint for Preliminary and Permanent Injunctive Relief and Damages Under the Antitrust Laws of the United States of America and Demand for Jury Trial ("First Amended Complaint") engaged in the purchase, distribution and resale of The Times to home delivery subscribers pursuant to terms and conditions of a written Home Delivery Dealer Agreement. Plaintiffs McGuire, Palaro, McKinsey, DeLuna, W.

H. Hopkins and James C. Dennis are parties to a Home Delivery Dealer Agreement of the form attached to the First Amended Complaint and marked as Exhibit A. The remaining Home Delivery Dealer plaintiffs are parties to a Home Delivery-Dealer Agreement of the form attached to the First Amended Complaint and marked as Exhibit B. Plaintiffs Richard M. Kemp, Jr., Brian D. Gruber, Charles P. White, Paul Jimenez, James D. O'Keefe, Irving Levy, David Waring, Horace W. Howland, Robert W. Ash, Paul L. Bluff, Angelo J. Masi, Steven Z. Krstich, Abraham Baron, Robert Cohen, Edgar G. Barclift, Leon F. Martinez and Charles C. Conn are presently, and have been during the four years preceding the filing of the First Amended Complaint, engaged in the purchase, distribution and resale of The Times to retail outlets (such as drugstores, markets, newsstands and motels), purchasers from newsracks and newsvendors pursuant to the terms and conditions of a written Street Sale Dealer Agreement with Times Mirror identical or similar to the form attached to the First Amended Complaint and marked as Exhibit C.

2. Times Mirror is and has been at all material times a corporation organized and existing under the laws of the State of California with its principal place of business in the City and County of Los Angeles, California. Times Mirror prints and publishes daily and Sunday the Los Angeles Times.

3. The Times is currently distributed by Times Mirror through two separate distribution systems. Under one system, Times Mirror sells the home delivery editions of The Times to Home Delivery Dealers, including plaintiffs, who resell to home delivery subscribers and other single copy purchasers. Home delivery subscribers constitute approximately 75% of the total circulation of The Times. Under the other system, Times Mirror sells the street sale editions of The Times to Street Sale Dealers, including plaintiffs, who distribute the paper to the public in one of two ways.

Most street sale papers are sold to individual purchasers through newsracks, while the remainder are sold to various retail outlets and newsvendors for re-sale to single copy purchasers.

4. All Home Delivery and Street Sale Dealers distribute The Times pursuant to the rights granted by written agreements between themselves and Times Mirror. Each of those agreements contains a provision which requires the dealer to sell The Times to his customers at a price which does not exceed the maximum price stipulated by Times Mirror pursuant to the California and Federal Fair Trade laws.

5. Times Mirror is in free and open competition with similar commodities of the same general class produced by others. Approximately 85% of the circulation of The Times is in Los Angeles and Orange Counties, and all of the plaintiffs except one distribute the paper within those two counties. Twenty daily newspapers, in addition to The Times, are *published* in Los Angeles and Orange Counties. In addition, over 100 weekly, semi-weekly and control distribution newspapers, including ethnic and religious publications, are also published and either *sold* or *delivered* at no cost in Los Angeles and Orange Counties. Moreover, three "national" newspapers, The Wall Street Journal, The Christian Science Monitor and The New York Times are *sold* daily in these two counties, with The New York Times having Sunday editions as well. The daily papers published in Los Angeles and Orange Counties are significant competitors to The Times, as are the numerous electronic and print media which originate in the area. While no single daily newspaper has a circulation which equals that of The Times, in the aggregate these daily newspapers have a weekday circulation of approximately 1,231,710 and a Sunday circulation of approximately 1,052,374. It should be added that although The Times is the dominant weekday and Sunday newspaper among newspapers *published* in Los Angeles and Orange Counties the rele-

vant market, with 46% of week-day, 54% of Sunday and 84% of morning newspapers published in this market, nevertheless its circulation is less than the total circulation of all newspapers distributed and sold weekly and Sunday in this market.

6. Under the Federal and State Fair Trade laws, Times Mirror is the publisher of a commodity which bears the trademark, brand or name of its producer and which is in free and open competition with similar commodities of the same general class produced by others. Times Mirror is therefore free to stipulate the maximum price at which The Times is resold by its dealers, including plaintiffs.

7. In the distribution of The Times, Times Mirror and its Home Delivery and Street Sale Dealers perform entirely separate functions. Times Mirror is the publisher of the paper. It prepares and prints over 1,000,000 copies of the newspaper daily and in excess of 1,200,000 on Sunday. It has agreements with 232 Home Delivery Dealers, including plaintiffs, in the greater Los Angeles metropolitan area. These Home Delivery Dealers each distribute approximately 2,800 newspapers each day to individual subscribers. Times Mirror transports the newspaper to a designated point and delivers them to the Home Delivery Dealer. The latter employs approximately 15 persons who physically deliver the newspaper to subscribers' homes, apartments, etc. Times Mirror also has agreements with 82 Street Sale Dealers, including plaintiffs, in the greater Los Angeles metropolitan area. Each Street Sale Dealer sells about 2,500 papers daily and about 3,800 on Sunday. Each Street Sale Dealer employs approximately eight persons, who deliver the newspaper to retail outlets, newsracks and newsvendors. These retail outlets and newsvendors sell single copies of the paper to individuals.

8. The Home Delivery Dealer performs the function of delivering the newspaper to homes, apartments, etc.,

daily and Sunday on a monthly subscription basis. The Home Delivery Dealer is not engaged in the business of selling newspapers to Street Sale Dealers, retail outlets and newsvendors, but in a few instances Home Delivery Dealers did make sales to the latter street Sale Vendors, retail outlets and newsvendors by "bootlegging" the same in violation of their agreements with The Times.

9. The Street Sale Dealer performs the function of selling and delivering the newspaper to stores, newsracks and newsvendors. The Street Sale Dealer is not engaged in the business of selling and delivering newspapers to homes, apartments, etc., on a monthly subscription basis, but in a few instances Street Sale Dealers did make sales to Home Delivery Dealers by "bootlegging" the same in violation of their agreements with The Times.

10. Times Mirror is not functionally on the same level as its Street Sale Dealers, nor does it compete on any level for the customers of its Street Sale Dealers. The relationship between Times Mirror and its Street Sale Dealers, including plaintiffs, is vertical in nature, not horizontal. Times Mirror is the publisher of the newspaper, not a wholesaler of it. Times Mirror publishes The Times and sells it to Street Sale Dealers who, in turn, endeavor to make sales through newsracks and to stores and newsvendors. Times Mirror does not sell directly to individual buyers in any part of Los Angeles or Orange Counties. Times Mirror does not sell directly to newsvendors or store accounts in either of those two counties. The Street Sale Dealer sells to individual buyers and to newsvendors and store accounts. There is no competition between the Street Sale Dealer and Times Mirror.

11. Since Times Mirror neither functions on the same level as its Street Sale Dealers, including plaintiffs, nor competes with them on any level, Times Mirror and its Street Sale Dealers are not both wholesalers within the meaning of the California and Federal Fair Trade laws.

12. For a number of years, Times Mirror has entered into written agreements with its Home Delivery and Street Sale Dealers which define the territories which the dealer is obligated to serve. However, there is no provision in any of these agreements specifically restricting any dealer, including plaintiffs, to sales within the designated territory.

13. On August 17, 1972, shortly after the filing of the First Amended Complaint in *Floyd W. McKinsey, et al. v. The Times Mirror Company*, Civil No. 72–1394–RF, Times Mirror sent letters to all of its dealers, including plaintiffs, informing them in writing that they were free to sell The Times wherever they wished, although each dealer continued to be committed to solicit and promote sales of The Times in the geographical area specified in his Dealer Agreement and to service all customers in that area.

14. At least since August 17, 1972, Times Mirror has had no agreement or understanding with any dealer, including plaintiffs, which confines the dealer to sales in any particular area. Plaintiffs have presented no facts which demonstrate otherwise.

15. For a number of years, Times Mirror has charged its dealers, including plaintiffs, different prices, or rates, for the copies of The Times purchased by them. The rate which each dealer pays for The Times is individualized to take into account the nature of his primary area of distribution. For example, a dealer whose territory is relatively flat and compact does not pay the same rate for the paper as a dealer whose territory is hilly and dispersed. Similarly, a dealer who services mostly single family dwellings where papers can be delivered with a minimum of stops does not pay the same rate as a dealer whose area is comprised largely of apartment buildings where numerous stops are required. This pricing method employed by Times Mirror is both fair

and necessary to reflect the variations between dealerships.

16. Times Mirror has, for over three decades, stipulated the price at which The Times is resold by dealers so that, by keeping the price of the newspaper at the lowest possible level, it could build the circulation of The Times to its current level and sustain that circulation even though it is in vigorous competition with other newspapers.

17. Times Mirror derives its revenues both from the sale of newspapers and from the sale of advertising. Times Mirror obtains approximately 85% of the revenue of The Times from advertising and approximately 15% from circulation. Revenues from advertising are much more significant than those from newspaper sales, however. In fact, the price received by Times Mirror for each copy of The Times is less than the cost of the newsprint contained in it. As a result, Times Mirror is vitally interested in the profitable flow of advertising revenue.

18. Advertising revenues of The Times are derived from the sale of advertising space. The amount of space purchased by advertisers is influenced by the price of advertising and circulation, among other factors. Price and circulation are the most important factors to advertisers since they are chiefly concerned with their costs expressed in terms of the number of potential buyers which The Times reaches.

19. Advertisers have access to statistics in the form of audit reports, surveys and representations from electronic and print media concerning the percentage of households in given areas reached or claimed to be reached by them. This rate of penetration, determined largely on the basis of circulation within a specific geographic area, along with the cost of reaching a given number of potential customers, is very important to advertisers in their purchasing decisions. The penetration of total households by The Times in Los Angeles and Orange Counties is 30% on weekdays and 35% on Sundays.

20. Circulation, and hence The Times rate of penetration, varies with the price of the newspaper. Circulation will decrease after an increase in the price. Thus, price increases must be carefully planned and instituted so as to minimize circulation losses and thereby preserve the circulation base which is essential to advertising revenue. The fierce competition for advertising revenues protects the public by imposing price restraints on Times Mirror.

21. Times Mirror is vitally concerned with the price of the paper because of its integral relationship to the whole revenue structure and ultimate profitability of the newspaper. Times Mirror is also interested in having a uniform price, since that uniformity facilitates the promotion of circulation and avoids hostility towards the newspaper from customers who are paying more for the paper than are other customers.

22. Events during the past three years have caused Times Mirror to reevaluate its current systems of distribution. The distribution systems have been repeatedly attacked under the antitrust laws in a series of lawsuits. Moreover, around May, 1975, it became clear that either the California or Federal Fair Trade law would be repealed, thus making the current distribution systems for The Times arguably illegal. As a result, Times Mirror formulated new distribution plans for The Times and, on October 13 and October 16, 1975, announced its intention to implement these plans on January 1 and January 5, 1976.

23. The new distribution systems for The Times represent a complete and total departure from those which have been employed for the past three decades. The fundamental concept of the new systems is that The Times will be sold directly by Times Mirror to its customers.

24. Effective January 1, 1976, all home delivery editions of The Times will be sold by Times Mirror directly to

home subscribers in Los Angeles and Orange Counties (the relevant market) without any intermediary purchaser. Times Mirror will do all customer solicitation, all billing, virtually all collections, will assume all risk of non-collections, and will receive all customer complaints and service requests. All the delivery agents will do is deliver. Times Mirror will enter into Written Delivery Agent Agreements with approximately 230 independent contractors, who will agree to assemble and deliver The Times to those subscribers designated on a list provided by Times Mirror. For that service, they will earn between $15,000 and $25,000 a year, a sum reasonably comparable to that which they have earned in the past.

25. The new system for home delivery is not a subterfuge or mask for a consignment agreement or any other agreement covering the purchase and resale of the paper. It is strictly a delivery agreement, under which Times Mirror employees will be selling the newspaper and making all other contacts with the subscriber. Compare Exhibits A and B (old home delivery system) with Exhibit D (new delivery agent system).

26. Effective January 5, 1976, all street sale editions of The Times will be sold directly by Times Mirror through newsracks to single copy purchasers, and directly by the company to newsvendors and retail outlets, in Los Angeles and Orange Counties (the relevant market), all without intermediary buyers and resellers. Distribution of street sale editions of The Times, including solicitation, delivery, the handling of complaints and collections, will be handled entirely by employees of Times Mirror. Compare Exhibit C (old street sale system) with new street sale system by Times Mirror employees.

27. In order to implement its new delivery systems, Times Mirror has announced to all of its current Home Delivery and Street Sale Dealers that their contracts will be terminated and that the new systems will become effective on January 1 and January 5, 1976, respectively. These terminations are being made pursuant to the company's express right, as stated in each Home Delivery and Street Sale Dealer Agreement, to terminate each agreement upon 30 days' written notice.

28. Times Mirror is contracting with approximately 230 new Home Delivery Agents. All persons currently operating under a Home Delivery Dealer Agreement, including plaintiffs, have been invited to participate in the new home delivery distribution plan for The Times by becoming Delivery Agents. As of the date of the hearing on plaintiffs' motion, approximately 200 Home Delivery Dealers had signed Delivery Agent Agreements.

29. Times Mirror is hiring 51 persons to serve in various managerial positions in the street sales distribution system. All Los Angeles and Orange County Street Sale Dealers, including plaintiffs, were invited to apply for these positions. On October 16, 1975, Bert R. Tiffany, Director of Circulation for The Times, sent all Street Sale Dealers, including plaintiffs, a letter which stated, in pertinent part:

"We will be conducting employment interviews and will hire the best qualified persons from among those interested in employment. In the meantime, if you are interested in employment with The Times, please contact us. Please feel free to call me personally if you have any special problems you would like to discuss."

This invitation was unconditionally extended to each and every plaintiff.

30. Beginning on October 17, 1975, employees of the Circulation Department of The Times contacted 30 to 35 Street Sale Dealers to see if they were interested in becoming employees of Times Mirror. On the same date or shortly thereafter, and in response to Tiffany's letter of October 16, approximately 35 Street Sale Dealers called the Circulation Department to indicate their inter-

est in becoming employees, and thereafter the Circulation Department responded to these calls. No plaintiff contacted Times Mirror about employment, and the employees of the Circulation Department were advised by the attorneys for Times Mirror not to contact them because of the pending antitrust litigation. However, Robert D. Nelson, Executive Vice President and General Manager of The Times, instructed the top officials of the Circulation Department to respond personally to any call from any plaintiff seeking information about employment, and to consider each applicant on his individual merits, regardless of his status as a litigant. As of the date of the hearing on their motion, no plaintiff had contacted anyone at Times Mirror to express an interest in employment.

31. On November 3 or 4, 1975 officials of Times Mirror with extensive personal knowledge concerning the applicants reviewed the applications for employment in the street sale system and chose the best qualified persons from among the applicants to fill the various managerial positions available. As of the date of the hearing, Times Mirror had entered into binding agreements with regard to 49 of these 51 positions.

32. In terminating its Home Delivery and Street Sale Dealer Agreements, Times Mirror did not in any way attempt to retaliate against plaintiffs, or any of them, because of their participation in antitrust litigation against the company. The contracts of all Home Delivery and Street Sale Dealers, whether or not they were involved in litigation, were terminated on exactly the same terms and at exactly the same time. Each Home Delivery and Street Sale Dealer, including plaintiffs, will be paid upon termination certain amounts set out in their Dealer Agreements. Moreover, all plaintiffs who currently are Home Delivery Dealers were offered the opportunity to become Delivery Agents, and all plaintiffs who are Street Sale Dealers were offered the opportunity to apply for employment in the Street Sales distribution system. There was no discrimination against plaintiffs whatsoever in extending the opportunity to participate in the new distribution systems.

33. The decision of Times Mirror to terminate its current distribution systems and to implement its new distribution systems as of January 1 and January 5, 1976 was made by Times Mirror unilaterally. There is no evidence of any agreement, combination or conspiracy between Times Mirror and any other person or entity.

34. The decision to terminate all independent contractor dealers and to transfer their functions to company employees was not made for the purpose of illegally fixing prices or for any other anticompetitive purpose whatsover. The principal objective of the new distribution systems of The Times is to increase its total circulation and penetration in Times Mirror's primary marketing area by having a low, uniform price for the paper. Times Mirror's decision was made to insure that its business was in full compliance with the law and to maintain the greatest degree of influence which the law will allow over all aspects of the circulation of The Times, including not only influence over the price but also over all other aspects of the distribution of the newspaper.

35. The new distribution systems announced by Times Mirror will have no anticompetitive effects. Since Times Mirror will sell The Times directly to all consumers, there will be no price fixing; rather, there will simply be a publisher establishing the price at which it sells its own product to its customers. Plaintiffs have presented no evidence to demonstrate that the new distribution systems will have any effect on the other daily newspapers sold in Los Angeles and Orange Counties. Finally, the new systems proposed by Times Mirror will not have any effect on intrabrand competition, since plaintiffs have not established that such competition existed on more than a *de minimis* basis.

36. In order to bring about the termination of the present methods of distributing The Times and to implement the new distribution systems, Times Mirror has hired or committed itself to hire hundreds of new employees and has expended or committed itself to expend millions of dollars. Some 89,500 square feet of space must be leased at an aggregate annual cost of about $210,000, leases for most of which have already been signed. Equipment of all kinds must be obtained, ranging from delivery vans and lift trucks to filing cabinets and typewriters. All of this equipment has been ordered, with much of it being already delivered, at an aggregate cost of more than $1 million. Offices have been remodeled at a total cost of more than $80,000. Telephone facilities are being expanded, the installation costs of which approximate $17,500, with the expanded facilities resulting in Times Mirror's telephone bill increasing by almost $280,000 annually. In order to give Times Mirror the capacity to bill directly almost 700,000 home subscribers to The Times, the data processing equipment of the company is being modified and expanded at a cost of more than $200,000. In addition, some 1,500 new full-time and part-time employees must be hired by Times Mirror, and many of these persons have already been placed on the payroll.

37. The total non-payroll out-of-pocket costs which Times Mirror is committed to expend in order to bring the present distribution systems of The Times to an orderly conclusion and to implement the new distribution systems will exceed $1,300,000, a substantial portion of which has already been spent. In addition, Times Mirror will incur additional payroll costs aggregating millions of dollars. Finally, Times Mirror is committed, under the existing Street Sale and Home Delivery Dealer Agreements, to pay its existing dealers well over $3 million upon the termination of their contracts.

38. Times Mirror has determined that the service its dealers, including plaintiffs, once performed can be better provided by delivery agents in the case of home delivery and by its own employees in the case of street sale deliveries and that its interest, in the future, will be less effectively represented by plaintiffs, whose interests are now clearly adverse to its own, or by a combination of plaintiffs and Times Mirror's own employees. Times Mirror believes it will suffer a loss of goodwill if it is required to continue plaintiffs as independent dealers for The Times after January 1 and January 5, 1976. Moreover, should Times Mirror prevail upon the merits, it will have unnecessarily disrupted its new sales organization, decreasing its effectiveness.

39. Plaintiffs have failed to demonstrate any specific intent on the part of Times Mirror to monopolize or to attempt to monopolize or to set prices or exclude competition in any portion of the market without legitimate business purpose, nor have plaintiffs demonstrated specific intent accompanied by predatory conduct directed toward accomplishing any unlawful purpose, nor have plaintiffs identified or offered any proof to show that Times Mirror conspired with any other person or entity to accomplish any unlawful purpose.

40. Plaintiffs have failed to demonstrate by any evidence whatsoever that Times Mirror has monopolized, attempted to monopolize or conspired to monoplize any portion of the market.

41. Plaintiffs have clearly indicated that, after January 1 and January 5, 1976, they wish to continue as independent dealers for The Times, but they desire the freedom to raise the price of The Times to whatever level they, in their own discretion, deem appropriate. The granting to plaintiffs of this right would not be in the public interest, which is best served by providing quality goods at the lowest possible price.

## CONCLUSIONS OF LAW

1. The question of whether or not a preliminary injunction should be

issued depends upon four factors. Plaintiffs have the burden of showing by a preponderance of the evidence each of the following:

a. That they have a strong likelihood or a reasonable certainty of succeeding in obtaining a permanent injunction prohibiting the very action they are attacking in their Motion for Preliminary Injunction;

b. That they will suffer irreparable injury or, put another way, that they cannot be compensated by money damages;

c. That the balance of the hardships tips in their favor; and

d. That the public interest would be served by issuing the preliminary injunction, or defeated by the failure to enter it.

■ 2. Plaintiffs have not sustained their burden of proving by a preponderance of the evidence that they have any likelihood or reasonable certainty of obtaining a permanent injunction affecting the current distribution systems of The Times, or preventing Times Mirror from terminating those systems and from instituting new methods of distributing The Times after January 1 and January 5, 1976.

■ 3. The maximum pricing provisions of the Dealer Agreements are lawful under the Fair Trade laws which are still in effect and will be in effect until January 1, 1976. Moreover, the current systems do not involve unlawful territorial or customer restraints, nor lawful discrimination in setting the rates which dealers pay for The Times. The current distribution systems of The Times are lawful under the antitrust laws.

■ 4. Times Mirror decided unilaterally to terminate the current systems and to institute new methods of distributing The Times after January 1 and January 5, 1976. This decision was made for good and valid business reasons, and was not intended as retaliation against plaintiffs for participating in antitrust litigation against Times Mirror. Times Mirror did not discriminate in any way against plaintiffs in effecting the terminations, or in offering plaintiffs the opportunity to participate in the new distribution systems. The termination of the existing Home Delivery and Street Sale Dealer Agreements is lawful under the antitrust laws.

■ 5. The new systems for distributing The Times, which provide for the sale of the paper directly to consumers and the using of independent delivery against only to delivery the home editions, are lawful under the antitrust laws.

■ 6. Plaintiffs have not been able to demonstrate that their remedy at law by way of money damages is not adequate. The damages, if any, suffered by plaintiffs can be fixed and measured with reasonable certainty at the point in time that their Dealer Agreements were terminated. Plaintiffs will have an opportunity at the trial on the merits to show that they have suffered compensable injury. Any injury being compensable by money damages, equitable relief is not justified.

■ 7. Plaintiffs' application for a preliminary injunction must also be denied because the balance of hardship tips decidedly in favor of Times Mirror. Plaintiffs will be paid everything to which they are entitled under the Dealer Agreements upon their termination. On the other hand, Times Mirror has spent or committed itself to spend millions of dollars to implement the new distribution systems, which investment will be wasted if Times Mirror is not allowed to go forward with its plans. Finally, while the hardships to plaintiffs are primarily financial, compensable in money damages, Times Mirror has demonstrated hardship of a more intangible nature, which will result from being required to resume use of plaintiffs' services pending trial.

■ 8. The public interest would not be served by the granting of a prelim-

inary injunction. A publisher like Times Mirror has the right to engage in any type of distribution it chooses so long as it does not violate the antitrust laws, and may terminate its current system of distribution in order to convert to a new form of distribution. Times Mirror has demonstrated that it has legitimate business reasons for converting to a new plan for distributing The Times after January 1 and January 5, 1976, and plaintiffs have failed to demonstrate that the new plan would violate the law in any way. So long as Times Mirror does not violate the law, the public interest is best served by allowing it to change its method of distribution in any way it desires. It would not be in the public interest for the Court to become involved in the operation of the business of Times Mirror. Therefore, the public interest is best served by allowing Times Mirror to go forward with the new systems.

EXHIBIT "A"

# THE TIMES MIRROR COMPANY

## LOS ANGELES TIMES

## HOME DELIVERY DEALER AGREEMENT

Dated........ January 1, 1970

Territory........ #1000 Palos Verdes Peninsula

Dealer........ Charles E. McGuire

Street........ #8 Clipper Road

City........ Palos Verdes Peninsula

State........ California, 90274.

Married........ X ........Single........ Birth Date........ July 14, 1929

Name of Spouse........ Joan

# THE TIMES MIRROR COMPANY
## LOS ANGELES TIMES
### HOME DELIVERY DEALER AGREEMENT

THIS AGREEMENT made and entered into this......1st......

day of..............January.............., 19.70..., by and between THE TIMES MIRROR COMPANY, a corporation, herein-

after sometimes called the Company and......Charles E.

McGuire......, hereinafter sometimes called the Dealer,

### WITNESSETH:

WHEREAS, the Company is engaged in the business of printing and publishing in the City of Los Angeles, State of California, a daily newspaper known as the Los Angeles Times, and the Dealer desires to engage in the business of purchasing copies of said newspaper and selling the same to purchasers and subscribers therefor.

NOW THEREFORE, it is understood and agreed as follows:

### SECTION I.

The Company covenants and agrees:

That the Company will sell to the Dealer in such quantities as may be required to supply purchasers and subscribers in the territory herein assigned to the Dealer, copies of the Los Angeles Times at the following prices:

Daily Subscription Copies at the rate of $....6.15..... per 100

Sunday Subscription Copies at the rate of $...11.50.......... per 100

Daily Sales Copies at the rate of $............... per 100

Sunday Sales Copies at the rate of $............... per 100

That promptly upon publication the Company will deliver such copies in bulk to the Dealer at a point in said territory or elsewhere as agreed upon by the parties.

That at regular intervals and at least once each calendar month the Company will furnish the Dealer with a bill or statement of the Dealer's account for copies furnished, which statement shall show the number of copies of both the Daily and Sunday editions of the Los Angeles Times furnished the Dealer and the amount claimed to be due and payable by the Dealer to the Company.

### SECTION II.

The Dealer covenants and agrees:

That the Dealer will purchase from the Company copies of the Los Angeles Times at the prices hereinabove set forth or at such other prices as from time to time may be fixed by the Company in accordance with the provisions of this agreement.

That on or before the 10th day of each calendar month hereafter the Dealer will promptly pay the Company at its office at Los Angeles, California, for all copies of the Los Angeles Times furnished or delivered to the Dealer for sale and distribution in the territory of the Dealer during the last preceding calendar month and all other indebtedness to said Company which the Dealer may have incurred in his transactions with the Company during any preceding calendar month, and that default in such payment shall constitute grounds for immediate cancellation of this agreement at the option of the Company.

That the Dealer will sell copies of the Los Angeles Times to regular subscribers and to single copy purchasers in his territory at the regular subscription and single copy prices established by the Company and in effect from time to time.

That the Dealer will use his best efforts to maintain and promote the volume of sales of the Los Angeles Times in his territory and at frequent intervals will thoroughly canvass said territory for the purpose of maintaining and promoting said volume of sales.

That the Dealer will prepare and maintain a full, correct, and up-to-date record of the names and addresses of subscribers to the Los Angeles Times in his territory, and upon demand will supply the Company lists of such subscribers to enable the Company to comply with the requirements of the Audit Bureau of Circulations. That upon termination of this agreement in any manner, upon demand of the Company, the Dealer will deliver all subscriber lists in his possession to the Company.

That the Dealer will not exhibit any list of subscribers to the Los Angeles Times or disclose any information regarding such subscribers to the publisher of any competitive newspaper or any person other than his own agents or employees and the Company and its authorized agents.

That the Dealer will not stamp upon or insert in copies of the Los Angeles Times or distribute with the same any advertising matter other than that furnished by the Company or permit such action by any other person except upon written consent of the Company.

That the Dealer will not assign or transfer or hypothecate this agreement or any rights thereunder or interest therein without the written consent of the Company first given, it being expressly understood that any attempt to effect such an assignment or transfer or hypothecation without such consent shall create no rights in the person to whom the same shall be made, and shall constitute grounds for immediate cancellation and termination of this agreement at the option of the Company.

That the Dealer will furnish a bond or other security satisfactory to the Company to secure payment of all sums that may become payable by the Dealer to the Company for the purchase price of copies of the Los Angeles Times furnished hereunder or for any other indebtedness to the Company which may be incurred by the Dealer.

## SECTION III.

The territory to which this agreement shall apply and in which the sale of copies of the Los Angeles Times by the Dealer

shall be made is known and designated as the......#1000..........

PALOS VERDES PENINSULA......territory and shall include the following territory:

Beginning at the intersection of Range Horse Ln. and Silver Spur Rd, thence westerly along an imaginary line to the northern most terminus of Basswood Ave., thence south along Basswood Ave. serving both sides to Montemalaga Dr., thence west along Montemalaga Dr. serving neither side to where it intersects the Palos Verdes Estates City limits. (as indicated in 1970 Thomas Bros. Guide), thence south and west following the Palos Verdes Estates city limits to the point where Via Borica intersects the Palos Verdes Estates City limits, thence south along an imaginary line to the north west corner of the Marymount College grounds, not serving said college, thence in a north easterly direction to the radar station on Crenshaw Blvd. which is just south of Crest Rd., thence north along Crenshaw Blvd., serving the west side only to Silver Spur Rd., thence west and north along Silver Spur Rd. serving the west side only to Range Horse Ln., the point of beginning.

Note: All of Via Sonoma and Woodfern Dr. will be served by dealer #998 - Palos Verdes Estates.

It is understood t.... the Company retains the right at its election to supply or effect distribution through others or others of the Los Angeles Times to all newsstands, newsdealers and other persons who are not carriers or bona fide regular home delivery subscribers in the above described territory.

## SECTION IV.

This agreement shall exist and remain in effect from the date hereof until the same shall be terminated by mutual consent of the parties in writing or by either party in accordance with the provisions herein set forth.

The Dealer at his option may terminate this agreement at any time by serving upon the Company a written notice of his intention so to do not less than thirty (30) days or more than forty-five (45) days prior to the date upon which said termination is to become effective according to the terms of such notice, paying the Company all sums due or payable under the terms hereof, and placing in the hands of the Company a sufficient cash deposit to apply in payment of all indebtedness of the Dealer to the Company including that for the purchase of all copies of the Los Angeles Times to be furnished during the period between the service of such notice and the date when termination thereunder shall become effective. The notice of intention to terminate this agreement by the Dealer may be served personally upon any officer of the Company or by depositing the same in the United States Post Office bearing sufficient postage, directed to the Company at its address, Times Mirror Square, Los Angeles, California 90053, in which case service shall be deemed complete upon mailing.

The Company at its option may terminate this agreement at any time by serving upon the Dealer a written notice of its intention so to do not less than thirty (30) days or more than forty-five (45) days prior to the date upon which said termination is to become effective according to the terms of such notice. The notice of intention to terminate this agreement by the Company may be served on the Dealer personally or by depositing the same in the United States Post Office bearing sufficient postage directed to the Dealer at his mailing address as disclosed by the records of the Company, in which case service shall be complete upon the date of mailing.

Should this agreement be terminated by the Company at its option in accordance with the provisions of the next preceding paragraph, within thirty (30) days after such termination shall become effective the Company will pay to the Dealer the sum

equal to $ 3.50 ........multiplied by the average number of bona fide regular subscribers to the Los Angeles Times in the territory assigned to the Dealer hereunder during the twelve (12) full calendar months immediately preceding the effective date of termination after deducting from said sum the amount of any indebtedness of the Dealer to the Company. The term "bona fide regular subscriber" as used in this paragraph shall include only persons regularly subscribing for and receiving either the daily or week-day issues or the Sunday and daily or week-day issues of the Los Angeles Times combined, on a monthly subscription basis.

The Dealer agrees in the event of termination of this agreement in any manner, or in the event of his assignment of his interest hereunder with the written consent of the Company first had and obtained, he will immediately pay to the Company a sum equal to the total amount which he shall have collected or

may thereafter collect from subscribers to the Los Angeles Times in his territory in advance for subscriptions covering any period subsequent to the date of such termination or assignment.

The death of the Dealer while this Agreement is in effect shall constitute an immediate termination of this Agreement and no rights hereunder shall pass to any representative of the deceased Dealer or his estate. In the event of such death, however, the Company hereby agrees to pay to the estate of the deceased Dealer the amounts that would be due under the provisions of this SECTION IV should this Agreement be terminated by the Company as described in this SECTION IV. The Dealer, on behalf of his representatives and estate, hereby agrees to accept such payment in full satisfaction of any claim or claims of any representative of the deceased Dealer arising from or related to this Agreement.

### SECTION V.

The prices to be paid the Company for copies of the Los Angeles Times are subject to change by the Company in its sole discretion, and should the Company desire to increase or decrease any price at which copies are to be purchased by the Dealer from the Company, it may do so by serving upon the Dealer either in person or by deposit in the United States Mail in the manner herein provided for service of notice by the Company of intention to terminate this agreement, a written notice of intention to effect such change, which notice shall set forth the change to be made and the date upon which the same shall become effective. No change made hereunder shall become effective until a minimum of ten (10) days have elapsed after personal service or mailing of the notice as herein provided.

### SECTION VI.

It is mutually understood and agreed that the Dealer is an independent contractor and not an employee or agent of the Company; that the Dealer shall hire and pay all persons which he may desire to assist him in the sale and distribution of copies of the Los Angeles Times, which said copies are purchased from the Company, and the Dealer shall exercise the sole and exclusive control and supervision of all of said persons engaged in said sale and distribution.

It is agreed and understood between the parties hereto that the Company is interested only in the results to be obtained by the Dealer, viz., the circulation and distribution in constantly increasing numbers of the Los Angeles Times, and that the manner and means to be employed by the Dealer are matters entirely within the authority and discretion of the Dealer, over which the Company has no authority or jurisdiction.

The Dealer does hereby covenant and agree to indemnify and hold the Company, its successors or assigns, harmless from any liabilities, claims, demands, costs, charges and expenses incident to any claim, loss, damage or injury to the person or property of the Dealer or to the person or property of any employees, agents, servants or any person subject to the supervision of the Dealer, or the person or property of any

person injured through the acts or negligence of the Dealer or of any employees, agents, servants or any person subject to the supervision of the Dealer, and the Dealer does hereby indemnify and hold the Company harmless from any and all damage or liability whatever for or on account of such loss, damage, or injury. The Dealer hereby covenants and agrees that he will not file, or cause to be filed, any suit against the Company founded on any claim for damage or liability whatever, for or on account of such loss, damage, or injury.

The Dealer agrees that he will carry Workmen's Compensation Insurance for the benefit of the Dealer's employees, in accordance with the laws of the State of California, and will carry adequate public liability insurance protecting the Dealer and the Company from liability for property damage and personal injuries occurring through the operation of all motor vehicles used by the Dealer and/or Dealer's employees engaged in the performance of this agreement or the sale of newspapers purchased hereunder.

The Dealer agrees to accept and does hereby accept exclusive liability for payment of any and all payroll taxes or contributions for Unemployment Insurance or Old Age Pensions, or annuities which are or may hereafter be measured by the wages, salaries or other remuneration, paid to employees of Dealer and to reimburse the Company for any and all such taxes, payments, or contributions which the Company may be required by court order, departmental regulation or otherwise, to pay. The Dealer further agrees to comply with all valid administrative regulations respecting assumption of liability for such taxes and contributions. In this connection the Company does not admit any liability for itself or its successors for such taxes, payments or contributions.

Immediately upon issuance of the same and within not less than ten (10) days thereafter, the Dealer shall furnish the Company a copy of each insurance policy and of all changes, cancellations or modifications thereof required under the terms of this contract to be obtained and maintained by the Dealer.

This Agreement shall constitute the entire agreement between the parties, superseding all previous representations of either party and all previous agreements between the parties. Any subsequent modification of this Agreement must be in writing.

IN WITNESS WHEREOF, this agreement has been duly executed in duplicate as of the day and year first above written.

THE TIMES MIRROR COMPANY

By.......................................
Bert R. Tiffany
Director of Circulation

.......................................
Charles E. McGuire.

EXHIBIT "B"

# THE TIMES MIRROR COMPANY
## LOS ANGELES TIMES
## HOME DELIVERY DEALER AGREEMENT

Execution Date..........August 21, 1972.................................................

Effective Date.........September 1, 1972.................................................

Dealership.........675.........................................................................

Dealer.........John S. Zinn................................................................

Street.........411 Flagship Road.......................................................

City.........Newport Beach................................................................

State.........California......................................................................

72/1

# THE TIMES MIRROR COMPANY

## LOS ANGELES TIMES
## HOME DELIVERY DEALER AGREEMENT

**THIS AGREEMENT** made and entered into this ......21st

day of ........August....., 19..72, to be effective on the ....1st.....

day of ...September..., 19..72, by and between the LOS AN-

GELES TIMES, a division of the Times Mirror Company, a

corporation, hereinafter called the Company and ....John......

S..-Zinn...................................., hereinafter called the Dealer.

### WITNESSETH:

WHEREAS, the Company is engaged in the business of printing and publishing in the City of Los Angeles, State of California, a daily newspaper known as the Los Angeles Times, and the Dealer desires to engage in the business of purchasing copies of said newspaper and selling the same to purchasers and subscribers thereof.

NOW THEREFORE, it is understood and agreed as follows:

### SECTION 1.

The Company covenants and agrees:

A. That the Company will sell to the Dealer copies of the Los Angeles Times at the following prices:

Daily Subscription Copies at the rate of $.......5.15 per 100

Sunday Subscription Copies at the rate of $....15.00 per 100

B. That promptly upon publication the Company will deliver such copies in bulk to the Dealer at a point as agreed upon by the parties.

C. That at regular intervals and at least once each calendar month the Company will furnish the Dealer with a bill or statement of the Dealer's account for copies furnished, which statement shall show the number of copies of both the Daily and Sunday editions of the Los Angeles Times furnished the Dealer and the amount claimed to be due and payable by the Dealer to the Company.

### SECTION II.

The Dealer covenants and agrees:

A. That the Dealer will purchase from the Company copies of the Los Angeles Times at the prices hereinabove set forth or at such other prices as from time to time may be fixed by the Company in accordance with the provisions of this agreement.

B. That each statement submitted to the Dealer by the Company for all copies of the Los Angeles Times furnished or delivered to the Dealer for sale or distribution during the last preceding calendar month and all other indebtedness to the Company which the Dealer may have incurred in his transactions with the Company during any preceding calendar month is due and payable to the Company at its office at Los Angeles, California on the tenth day, and will be considered delinquent after the twentieth day, of the calendar month in which the statement is mailed to the Dealer, and that default in such payments shall constitute grounds for immediate cancellation of this agreement at the option of the Company.

C. That the Dealer will not sell copies of the Los Angeles Times to regular subscribers and single copy purchasers except at the fair trade prices as stipulated by the Company in Schedule A hereto. The Company may change the stipulated fair trade prices from time to time by sending a notice to the Dealer in the form of a revised Schedule A, which specifies its effective date and the new stipulated fair trade prices.

D. That the Dealer will use his best efforts to maintain and promote the volume of sales of the Los Angeles Times in the territory described in paragraph A of section III and at frequent intervals will thoroughly canvass said territory for the purpose of maintaining and promoting said volume of sales.

E. That the Dealer will prepare and maintain a full, correct, and up-to-date record of the names and addresses of subscribers to whom the Dealer sells copies of the Los Angeles Times, and upon demand will supply the Company lists of such subscribers to enable the Company to comply with the requirements of the Audit Bureau of Circulations.

F. That the Dealer will not exhibit any list of subscribers to the Los Angeles Times or disclose any information regarding such subscribers to the publisher of any competitive newspaper or any person other than his own employees and the Company and its authorized agents.

G. That the Dealer will not stamp upon or insert in copies of the Los Angeles Times or distribute with the same any advertising matter other than that furnished by the Company or permit such action by any other person except upon written consent of the Company.

H. That the Dealer will not assign or transfer or hypothecate this agreement or any rights thereunder or interest therein without the written consent of the Company first given, it being expressly understood that any attempt to effect such an assignment or transfer or hypothecation without such consent shall create no rights in the person to whom the same shall be made, and shall constitute grounds for immediate cancellation and termination of this agreement at the option of the Company.

I. That the Dealer will furnish a bond or other security satisfactory to the Company to secure payment of all sums that may become payable by the Dealer to the Company.

## SECTION III.

A. The territory in which the Dealer agrees to use his best efforts to maintain and promote the volume of sales of the Los Angeles Times and in which the Dealer agrees to canvass thoroughly at frequent intervals to achieve the maximum sale and distribution of the Los Angeles Times is designated as dealership number ..675... and is described as follows:

Beginning at an imaginary point where the line splitting sections #130 and #132, also known as the 7000 block of Pacific Coast Hwy., meet the Pacific Ocean shoreline, thence following the westerly shoreline of Newport Bay serving everything on the north, not including Balboa Isle, but including Linda Island and Harbor Island in their entirety, thence continuing along the easterly shoreline of Upper Newport Bay to a point where San Joaquin Hills Rd. would intersect if it were extended west past it's terminus, thence east on San Joaquin Hills Rd. serving the south side only to Jamboree Rd., thence northeast on Jamboree Rd. serving the east side only to Ford Rd., thence east on Ford Rd. serving the south side only to MacArthur Blvd. (Proposed Corona Del Mar Frwy.) thence south on MacArthur Blvd. serving the west side only to a point where Port Seabourne Way would intersect the proposed Corona Del Mar Frwy., if Port Seabourne Way were extended west past it's terminus, thence easterly along this line to Port Seabourne Way ., thence east along Port Seabourne Way. serving the south side only and continuing due east on an imaginary line to the middle of section #135., thence southwest along an imaginary line to the ocean, the point of beginning.

B. It is understood that the Company may enter into agreements with third parties to effect distribution of the Los Angeles Times to newsstands, news dealers or other retail outlets in the above described territory. The Company agrees, however, that it will not enter into any agreements which require the other party thereto to promote the sale of the Los Angeles Times to home delivery subscribers in the above described territory. It is further understood that the Company retains the right at its election to sell the Los Angeles Times directly to newsstands, news dealers, retail outlets and others located in the above described territory, except that the Company will not sell the Los Angeles Times directly to home delivery subscribers in the above described territory.

## SECTION IV.

A. This agreement shall exist and remain in effect from the effective date hereof until the same shall be terminated by mutual consent of the parties in writing or by either party in accordance with the provisions herein set forth.

B. The Dealer at his option may terminate this agreement at any time by serving upon the Company a written notice of his intention so to do not less than thirty (30) days prior to the date upon which said termination is to become effective according to the terms of such notice and by paying to the Company upon the effective termination date all sums due or payable under the terms hereof. The notice of intention to terminate this agreement by the Dealer may be served personally upon the Director of Circulation of the Los Angeles Times or by depositing the same in the United States Mail bearing sufficient postage, directed to the Company at its address, Times Mirror Square, Los Angeles, California 90053, Attention: Director of Circulation, Los Angeles Times, in which case service shall be deemed complete upon the date of mailing.

C. The Company at its option may terminate this agreement at any time by serving upon the Dealer a written notice of its intention so to do not less than thirty (30) days prior to the date upon which said termination is to become effective according to the terms of such notice. The notice of intention to terminate this agreement by the Company may be served on the Dealer personally or by depositing the same in the United States Mail bearing sufficient postage directed to the Dealer at his mailing address as disclosed by the records of the Company, in which case service shall be deemed complete upon the date of mailing.

D. Should this agreement be terminated by the Company at its option in accordance with the provisions of paragraph C of this section IV upon the settlement of all accounts between the Company and the Dealer, the Company will pay to the Dealer a sum equal to $4.50 if the termination becomes effective within one year from the effective date hereof or $5.00 if the termination becomes effective after one year subsequent to the effective date hereof, multiplied by the average number of bona fide regular subscribers to the Los Angeles Times in the territory described in paragraph A of section III during the twelve (12) full calendar months immediately preceding the effective date of termination after deducting from said sum the amount of any indebtedness of the Dealer to the Company. The term "bona fide regular subscriber" as used in this paragraph shall include only persons regularly subscribing for and receiving either the daily or week-day issues or the Sunday and daily or week-day issues of the Los Angeles Times combined on a monthly subscription basis. Upon the settlement of all accounts between the Company and the Dealer, and concurrently with the payment of all amounts due in accordance therewith, the Company and the Dealer shall enter into a mutual release whereby each party releases the other from any and all claims arising from or related to the negotiation, execution, performance or termination of this agreement.

E. The Dealer agrees in the event of termination of this agreement in any manner, or in the event of his assignment of his interest hereunder with the written consent of the Company first had and obtained, he will immediately pay to the Company a sum equal to the total amount which he shall have collected or may thereafter collect from subscribers to the Los Angeles Times in advance for subscriptions covering any period subsequent to the date of such termination or assignment. In the event of termination of this agreement in any manner,

the Dealer further agrees to deliver to the Company all sub-scriber lists and records which accurately state the name, address and the up-to-date status of each subscriber's account as of the date of termination. If such subscriber records are not delivered to the Company upon termination of this agreement, the total amount payable to the Dealer under paragraph D of this section IV shall be reduced by the amount by which the average num-ber of bona fide regular subscribers is multiplied as provided in said paragraph for each subscriber for which such records are ot received.

F. The death of the Dealer while this agreement is in effect shall constitute an immediate termination of this agree-ment and no rights hereunder shall pass to any representative of the deceased Dealer or his estate. In the event of such death, however, the Company hereby agrees to pay to the estate of the deceased Dealer the amounts that would be due under the pro-visions of this section IV should this agreement be terminated by the Company as described in this section IV. The Dealer, on behalf of his representatives and estate, hereby agrees to accept such payment in full satisfaction of any claim or claims of any representative of the deceased Dealer arising from or related to this agreement.

### SECTION V.

The prices to be paid the Company for copies of the Los Angeles Times are subject to change by the Company and should the Company desire to increase or decrease any price at which copies are to be purchased by the Dealer from the Company, it may do so by serving upon the Dealer either in person or by deposit in the United States Mail in the manner herein provided for service of notice by the Company of inten-tion to terminate this agreement, a written notice of intention to effect such change, which notice shall set forth the change to be made and the date upon which the same shall become effective. No change made hereunder shall become effective until a minimum of ten (10) days have elapsed after personal service or mailing of the notice as herein provided.

### SECTION VI.

A. It is mutually understood and agreed that the Dealer is an independent contractor and not an employee or agent of the Company; that the Dealer shall hire and pay all persons which he may desire to assist him in the sale and distribution of copies of the Los Angeles Times, which said copies are purchased from the Company, and the Dealer shall exercise the sole and exclu-sive control and supervision of all of said persons engaged in said sale and distribution.

B. It is agreed and understood between the parties hereto that the Company is interested only in the results to be obtained by the Dealer, viz, the circulation and distribution in constantly increasing numbers of the Los Angeles Times, and that the manner and means to be employed by the Dealer are matters entirely within the authority and discretion of the Dealer, over which the Company has no authority or jurisdiction.

C. The Dealer does hereby covenant and agree to indem-nify and hold the Company, its successors or assigns, harmless from any liabilities, claims, demands, costs, charges and expenses incident to any claim, loss, damage or injury to the person or property of the Dealer or to the person or property of any employees, agents, servants or any person subject to the super-vision of the Dealer, or to the person or property of any person injured through the acts or negligence of the Dealer or of any employees, agents, servants or any person subject to the super-vision of the Dealer, and the Dealer does hereby indemnify

and hold the Company harmless from any and all damages or liability whatever for or on account of such loss, damage, or injury. The Dealer hereby covenants and agrees that he will not file, or cause to be filed, any suit against the Company founded on any claim for damage or liability whatever, for or on account of such loss, damage, or injury.

D. The Dealer agrees that he will carry Workmen's Com-pensation Insurance for the benefit of the Dealer's employees in accordance with the laws of the State of California or such other state in which the Dealer is located and will maintain Comprehensive General and Automobile Liability Insurance (bodily injury and property damage including Broad Form Contractual Liability specifying this agreement) protecting the Dealer and the Company, including coverage for the operation of all motor vehicles used by the Dealer and/or Dealer's employees engaged in the performance of this agreement or in the sale of newspapers purchased hereunder. All liability insur-ance shall be written at limits of at least $100,000 per person, $300,000 per occurrence for bodily injury and $50,000 for property damage. The Company shall be named as an addi-tional insured under said liability insurance coverage as to any claim or claims for damage or injury to persons or property resulting from or growing out of the operations of the dealer-ship. These insurance policies shall not be cancelled without first providing a 30-day notice of cancellation to the Company.

E. Immediately upon issuance of the same and within not less than ten (10) days thereafter, the Dealer shall furnish the Company a Certificate of Insurance for each policy required under the terms of this contract to be obtained and maintained by the Dealer.

F. The Dealer agrees to accept and does hereby accept exclusive liability for payment of any and all payroll taxes or contributions for Unemployment Insurance or Old Age Pen-sions. or annuities which are or may hereafter be measured by. the wages, salaries or other remuneration, paid to employees of Dealer and to reimburse the Company for any and all such taxes, payments, or contributions which the Company may be required by court order, departmental regulation or otherwise, to pay. The Dealer further agrees to comply with all valid administrative regulations respecting assumption of liability for such taxes and contributions. In this connection the Com-pany does not admit any liability for itself or its successors for such taxes, payments or contributions.

G. This agreement shall constitute the entire agreement between the parties, superseding all previous representations of either party and all previous agreements between the parties. Any subsequent modification of this agreement must be in writing.

IN WITNESS WHEREOF, this agreement has been duly executed as of the day and year first above written.

LOS ANGELES TIMES,
a division of
The Times Mirror Company

By...... *Bert R. Tiffany* ......
Bert R. Tiffany
Director of Circulation

......*John S. Zinn*......
Dealer
John S. Zinn

Effective Date _____ September 1, 1972 _____

Name of Dealer _____ John S. Zinn _____

Dealership Number _____ 675 _____

SCHEDULE A
TO
# THE TIMES MIRROR COMPANY
## LOS ANGELES TIMES
### HOME DELIVERY DEALER AGREEMENT
#### SETTING FORTH STIPULATED FAIR TRADE PRICES

---

## MONTHLY SUBSCRIPTION RATES

| | |
|---|---|
| Daily & Sunday | $3.50 |
| Daily Only | 3.00 |
| Sunday Only | 2.00 |

## SINGLE COPY PRICES

| | |
|---|---|
| Daily | $ .10 |
| Sunday | .50 |

EXHIBIT "C"

# THE TIMES MIRROR COMPANY
## LOS ANGELES TIMES
### STREET SALE DEALER AGREEMENT

Dated................. July 5, 1965

Territory................ 7154

Dealer................ Horace W. Howland

Street................ 2323 Wayne Avenue

City................ Los Angeles 27

State................ California

Married........ X ........Single................Birth Date........ 11-18-14

Name of Spouse................ Ethel

# THE TIMES MIRROR COMPANY

## LOS ANGELES TIMES

### STREET SALE DEALER AGREEMENT

THIS AGREEMENT made and entered into this......5th......

day of................July................, 19...65..., by and between

THE TIMES MIRROR COMPANY, a corporation, herein-

after sometimes called the Company and......Horace W.

Howland..............................., hereinafter sometimes called the Dealer,

### WITNESSETH:

WHEREAS, the Company is engaged in the business of printing and publishing in the City of Los Angeles, State of California, a daily newspaper known as the Los Angeles Times, and the Dealer desires to engage in the business of purchasing copies of said newspaper and selling the same to newsdealers, newsvendors and the public.

NOW, THEREFORE, it is understood and agreed as follows:

### SECTION I.

The Company covenants and agrees:

That the Company will sell to the Dealer in such quantities as may be required to supply purchasers in the territory herein assigned to the Dealer, copies of the Los Angeles Times at the following prices:

| | |
|---|---|
| Daily Sales Copies at the rate of | $...4.00... per 100 |
| Sunday Sales Copies at the rate of | $...13.80... per 100 |

That at regular intervals and at least once each calendar week the Company will furnish the Dealer with a bill or statement of the Dealer's account for copies furnished, which statement shall show the number of copies of the Los Angeles Times furnished the Dealer and the amount claimed to be due and payable by the Dealer to the Company.

### SECTION II.

The Dealer covenants and agrees:

That the Dealer will purchase from the Company copies of the Los Angeles Times at the prices hereinabove set forth or at such other prices as from time to time may be fixed by the Company in accordance with the provisions of this agreement.

That on or before Friday of each calendar week hereafter the Dealer will promptly pay the Company at its office at Los Angeles, California, for all copies of the Los Angeles Times furnished or delivered to the Dealer for sale and distribution in the territory of the Dealer during the last preceding calendar week and all other indebtedness of said Company which the Dealer may have incurred in his transactions with the Company during any preceding calendar week, and that default in such payment shall constitute grounds for immediate cancellation of this agreement at the option of the Company.

That the Dealer will sell copies of the Los Angeles Times to newsdealers and other purchasers in his territory at such prices as will maintain the regular prices to the public established by the Company and in effect from time to time.

That the Dealer will use his best efforts to maintain and promote the volume of sales of the Los Angeles Times in his territory and at frequent intervals will thoroughly canvass said territory for the purpose of maintaining and promoting said volume of sales

That the Dealer will not stamp upon or insert in copies of the Los Angeles Times or distribute with the same any advertising matter other than that furnished by the Company or permit such action by any other person except upon written consent of the Company.

That the Dealer will not assign or transfer or hypothecate this agreement or any rights thereunder or interest therein without the written consent of the Company first given, it being expressly understood that any attempt to effect such an assignment or transfer or hypothecation without such consent shall create no rights in the person to whom the same shall be made, and shall constitute grounds for immediate cancellation and termination of this agreement at the option of the Company.

That the Dealer will furnish a bond or other security satisfactory to the Company to secure payment of all sums that may become payable by the Dealer to the Company for the purchase price of copies of the Los Angeles Times furnished hereunder or for any other indebtedness to the Company which may be incurred by the Dealer.

## SECTION III.

The territory to which this agreement shall apply and in which the sale of copies of the Los Angeles Times by the Dealer shall be made is known and designated as Street Sale Territory

No. __7154__ and shall include the following territory:

**Beginning at Virgil Ave. and Beverly Blvd., thence west on Beverly Blvd. serving both sides to Western Ave., thence north on Western Ave. serving both sides, and continuing directly north on an imaginary line serving both sides extended to Vista Del Valle, thence east on an imaginary line serving the south side only to a point where it would join Hillhurst Ave. if Hillhurst Ave. were extended north, thence south along this imaginary line serving both sides extended to Hillhurst Ave., and continuing south on Hillhurst Ave. serving both sides and continuing south on Virgil Ave. serving both sides to Beverly Blvd., the point of beginning.**

**NOTE:** The dealership described above will be served by Dealer #7154 with the exception of the following corners or spots which are served by Hustlers working for the Night Street Dealers:

 **Santa Monica & Vermont**
 **Sunset & Vermont**
 **Franklin & Hillhurst (Dailies Only)**
 **Franklin & Vermont**
 **Hollywood & Normandy**
 **Hollywood & Western (Southwest Cor)**
 **Hollywood & Western (Northeast Corner)**
 **Santa Monica & Western (Southwest Cor)**
 **Santa Monica & Western (Southeast Cor)**
 **Melrose & Western**
 **Beverly & Western**
 **Beverly & Vermont**
 **1533 North Vermont**

**The above listed corners and spots will be served by the Hustlers working for the Night Street Dealers, only with the following editions:**

 **DAILIES - Preview Racing; Preview Complete Racing; Early CC**

 **SUNDAYS - Third Bulldog Racing; Third Bulldog Complete Racing; Early CC**

Unless otherwise specifically provided herein, this agreement shall not cover Home-Delivered circulation of the Los Angeles Times.

## SECTION IV.

This agreement shall exist and remain in effect from the date hereof until the same shall be terminated by mutual consent of the parties in writing or by either party in accordance with the provisions herein set forth.

The Dealer at his option may terminate this agreement at any time by serving upon the Company a written notice of his intention so to do not less than thirty (30) days or more than forty-five (45) days prior to the date upon which said termination is to become effective according to the terms of such notice, paying the Company all sums due or payable under the terms hereof, and placing in the hands of the Company a sufficient cash deposit to apply in payment of all indebtedness of the Dealer to the Company including that for the purchase of all copies of the Los Angeles Times to be furnished during the period between the service of such notice and the date when termination thereunder shall become effective. The notice of intention to terminate this agreement by the Dealer may be served personally upon any officer of the Company or by depositing the same in the United States Post Office bearing sufficient postage, directed to the Company at its address, The Times Building, Times Mirror Square, Los Angeles, California, in which case service shall be deemed complete upon mailing.

The Company at its option may terminate this agreement at any time by serving upon the Dealer a written notice of its intention so to do not less than thirty (30) days or more than forty-five (45) days prior to the date upon which said termination is to become effective according to the terms of such notice. The notice of intention to terminate this agreement by the Company may be served on the Dealer personally or by depositing the same in the United States Post Office bearing sufficient postage directed to the Dealer at __2323 Wayne Avenue Calif.__ __Los Angeles 27__ or at such other address as the Dealer may hereafter designate in writing for the purpose, in which case service shall be complete upon the date of mailing.

Should this agreement be terminated by the Company at its option in accordance with the provisions of the next preceding paragraph, the Company will pay the Dealer, within thirty (30) days after such termination shall become effective, a sum equal to $2.00 (should the termination become effective within one year after the date hereof) or $3.00 (should the termination become effective after one year subsequent to the date hereof) multiplied by the average per-day net paid street sale circulation, Daily and Sunday combined, of the Los Angeles Times in the territory held by the Dealer hereunder at the time of termination, determined on the basis of the number of copies of the Los Angeles Times sold by the Company for distribution in such territory less the number of copies returned as disclosed from the records of the Company during the fifty-two (52) full calendar weeks immediately preceding the effective date of termination, after deducting from said sum the amount of any indebtedness of the Dealer to the Company.

## SECTION V.

The prices to be paid the Company for copies of the Los Angeles Times are subject to change by the Company in its sole discretion, and should the Company desire to increase or decrease any price at which copies are to be purchased by the Dealer from the Company, it may do so by serving upon the Dealer either in person or by deposit in the United States Mail in the manner herein provided for service of notice by the Company of intention to terminate this agreement, a written notice of intention to effect such change, which notice shall set forth the change to be made and the date upon which the same shall become effective. No change made hereunder shall become effective until a minimum of ten (10) days have elapsed after personal service or mailing of the notice as herein provided.

## SECTION VI.

It is mutually understood and agreed that the Dealer is an independent contractor and not an employee or agent of the Company; that the Dealer shall hire and pay all persons which he may desire to assist him in the sale and distribution of copies of the Los Angeles Times, which said copies are purchased from the Company, and the Dealer shall exercise the sole and exclusive control and supervision of all of said persons engaged in said sale and distribution.

It is agreed and understood between the parties hereto that the Company is interested only in the results to be obtained by the Dealer, viz., the circulation and distribution in constantly increasing numbers of the Los Angeles Times, and that the manner and means to be employed by the Dealer are matters entirely within the authority and discretion of the Dealer, over which the Company has no authority or jurisdiction.

The Dealer does hereby covenant and agree to indemnify and hold the Company and/or its successors harmless from any liabilities, claims, demands, costs, charges and expenses incident to any claim, loss, damage or injury to the person or property of the Dealer or to the person or property of any employees or agents of the Dealer, or to the person or property of any person injured through the acts or negligence of the Dealer or of any of the Dealer's employees, agents, or servants, and the Dealer does hereby indemnify and hold the Company harmless from

any and all damage, liability whatever for or on account of such loss, damage or injury. The Dealer hereby covenants and agrees that he will not file, or cause to be filed, any suit against the Company founded on any claim for damage or liability whatever, for or on account of such loss, damage or injury.

The Dealer agrees that he will carry Workmen's Compensation Insurance for the benefit of the Dealer's employees, in accordance with the laws of the State of California, and will carry adequate public liability insurance protecting the Dealer and the Company from liability for property damage and personal injuries occurring through the operation of all motor vehicles used by the Dealer and/or Dealer's employees engaged in the performance of this agreement or the sale of newspapers purchased hereunder.

The Dealer agrees to accept and does hereby accept exclusive liability for payment of any and all payroll taxes or contributions for Unemployment Insurance or Old Age Pensions, or annuities which are or may hereafter be measured by the wages, salaries or other remuneration, paid to employees of Dealer and to reimburse the Company for any and all such taxes, payments, or contributions which the Company may be required by court order, departmental regulation or otherwise, to pay. The Dealer further agrees to comply with all valid administrative regulations respecting assumption of liability for such taxes and contributions. In this connection the Company does not admit any liability for itself or its successors for such taxes, payments or contributions.

Immediately upon issuance of the same and within not less than ten (10) days thereafter, the Dealer shall furnish the Company a copy of each insurance policy and of all changes, cancellations or modifications thereof required under the terms of this contract to be obtained and maintained by the Dealer.

IN WITNESS WHEREOF, this agreement has been duly executed in duplicate as of the day and year first above written.

THE TIMES MIRROR COMPANY

By...*Bert R. Tiffany*...........

*Grace W. Cleveland*

EXHIBIT "D"

## LOS ANGELES TIMES

### DELIVERY AGENT AGREEMENT
### HOME DELIVERY

AGREEMENT dated _____

to/become effective on ___January 1, 1976___

between the Los Angeles Times, a division of The Times Mirror Company, a California corporation, hereinafter called "the Company" and

___Charles E. McGuire___

hereinafter called the "Delivery Agent".

The Company is engaged in the business of printing and publishing the Los Angeles Times, a newspaper published seven days a week. In the past the Company has sold the newspaper to Home Delivery Dealers who, in turn, have resold the newspapers to home delivery subscribers. The Company has terminated the agreements with Home Delivery Dealers in designated areas and hereafter the newspaper will be sold by the Company directly to home delivery subscribers in those areas in accordance with terms of sale established by the Company.

The Company desires to retain the services of the Delivery Agent as an independent contractor to deliver the Los Angeles Times to the Company's home delivery subscribers and the Delivery Agent desires to render such service to the Company, in accordance with the provisions of this agreement.

1. The Delivery Agent agrees as follows:

(a) To deliver the Los Angeles Times to the home delivery subscribers of the Los Angeles Times who shall be designated to the Delivery Agent by the Company from time to time in the form of a written list containing the name and address of each home delivery subscriber in the delivery area and designating the days on which each home delivery subscriber is to receive the Los Angeles Times. The Company will supply the Delivery Agent regularly with additions to, deletions from or other changes in the subscriber delivery list so as to keep the list current.

(b) To deliver a complete copy of the Los Angeles Times, including special sections, in a convenient and proper place in a dry condition to each home delivery subscriber in the delivery area by not later than, under normal conditions, 6:00 a.m. on weekdays and 7 00 a.m. on Sundays. When the Company informs the Delivery Agent prior to 10:30 a.m. on weekdays and 11:30 a.m. on Sunday that the paper has not been delivered, or has been delivered in an unacceptable condition, to any home delivery subscriber located in the delivery area, the Delivery Agent will promptly deliver a copy of the Los Angeles Times to any such subscriber.

(c) Not to stamp upon, insert in or attach to copies of the Los Angeles Times any advertising or other matter which is not furnished to the Delivery Agent by the Company, except with the prior written consent of the Company.

(d) Not to impose any charge upon the home delivery subscriber for delivery or other services rendered pursuant to this agreement.

**2.** The Company agrees to pay to the Delivery Agent the following monthly fees:

(a) $800.00, plus

(b) The sum of the following:

(i) $ .044 for each daily (Monday through Saturday) copy of the Los Angeles Times delivered to home delivery subscribers serviced by the Delivery Agent, and

(ii) $ .084 for each Sunday copy of the Los Angeles Times delivered to home delivery subscribers serviced by the Delivery Agent.

(c) The Company agrees to pay the monthly fees due to the Delivery Agent under this paragraph on or before the 10th day of the month immediately following the month in which the services were rendered.

(d) The monthly fees payable to the Delivery Agent by the Company pursuant to this paragraph may be changed by the Company at any time prior to December 31, 1976 upon delivering not less than 30 days prior written notice to the Delivery Agent of the new fees.

**3.** (a) The Company will bill its home delivery subscribers by mail and contemplates that the bulk of its collections will be by mail. However, upon request of the Company, the Delivery Agent will undertake door-to-door collection of monies due to the Company from home delivery subscribers in the delivery area. At a time designated by the Company, the Delivery Agent will deliver to the Company a written accounting of all amounts collected accompanied by a remittance of the amounts collected, as reduced by a collection fee of 18 per cent of all collections made by the Delivery Agent. The collection fee payable under this paragraph may be changed by the Company at any time prior to December 31, 1976 upon delivering not less than 30 days prior written notice to the Delivery Agent.

(b) Upon the request of the Company from time to time, the Delivery Agent will deliver sample copies of the Los Angeles Times. The Company will pay to the Delivery Agent on the date set forth in paragraph 2(c) a fee equal to the amount set forth in paragraph 2(b)(i) for each daily sample delivered and a fee equal to the amount set forth in paragraph 2(b)(ii) for each Sunday sample delivered.

**4.** The area in which the Delivery Agent will render the delivery and collection services described in this agreement is set forth in Exhibit "A" to this agreement (referred to throughout this agreement as the "delivery area"). The Company agrees that all home delivery subscribers to the Los Angeles Times located in the delivery area will be serviced by the Delivery Agent.

**5.** The Company agrees to make delivery to the Delivery Agent at a place mutually acceptable to the Company and the Delivery Agent of the number of copies of the Los Angeles Times required by the Delivery Agent each day to make delivery to all home delivery subscribers to the Los Angeles Times located in the delivery area as provided in this agreement.

**6.** (a) In consideration of the rights granted by the Company to the Delivery Agent pursuant to this agreement, within 60 days of the effective date of this agreement the Delivery Agent agrees to pay to the Company $5,000.

(b) Should this agreement be terminated by the Company in accordance with the provisions of this agreement, or should the term of this agreement expire, the Company will pay to the Delivery Agent any amount paid to the Company by the Delivery Agent under subparagraph (a), above, after deducting the amount of any indebtedness of the Delivery Agent to the Company.

**7.** The Delivery Agent may assign his rights and obligations under this agreement to any person capable of fully performing the Delivery Agent's obligations under this agreement, subject to receiving the prior written approval of the Company, which approval will not be unreasonably withheld. The rights and obligations of the Company shall be assumed by any successor to the Company. The rights granted by this paragraph shall not be exercisable by the Delivery Agent until December 31, 1977.

**8.** (a) Unless otherwise terminated as provided herein, this agreement shall continue in effect for 24 months from

January 1, 1976 .

The Company, at its option, may continue this agreement in effect for succeeding periods of 24 months by notifying the Delivery Agent in writing of its election to do so not less than 30 days prior to the termination date of the contract term then in effect.

(b) If either the Company or the Delivery Agent fails to fully perform any of its obligations under this agreement, the other party may terminate the agreement forthwith upon written notice of termination to the other party and, except as otherwise provided in this paragraph 8, the Company may not terminate this agreement without such cause. Cause for termination of this agreement shall be deemed to exist if service complaints from home delivery subscribers in the delivery area exceed an acceptable level or if the Delivery Agent fails to maintain acceptable customer relations. The Delivery Agent may terminate this agreement without cause by delivering not less than 30 days prior written notice of termination to the Company.

ACKNOWLEDGEMENT OF RE-
CEIPT

STATE OF CALIFORNIA
COUNTY OF LOS ANGELES } ss.

Defendant, The Times Mirror Company, through its attorneys of record, hereby acknowledge receipt of a true copy of FIRST AMENDED COMPLAINT FOR PRELIMINARY AND PERMANENT INJUNCTIVE RELIEF AND DAMAGES UNDER THE ANTITRUST LAWS OF THE UNITED STATES OF AMERICA AND DEMAND FOR JURY TRIAL this 19th day of November, 1975.

ROBERT C. LOBDELL
WILLIAM A. NIESE
THE TIMES MIRROR COMPANY
Times Mirror Square
Los Angeles, CA 90053

GIBSON, DUNN & CRUTCHER
JOHN J. HANSON
DONALD L. ZACHARY
515 South Flower Street
Los Angeles, CA 90071

By _Steven C. McCracken_

Attorneys for THE TIMES MIRROR COMPANY

ORDER DENYING PRELIMINARY INJUNCTION

The motion of plaintiffs for a preliminary injunction came on for hearing at 10:00 a. m. on Monday, November 24, 1975, before the above-entitled Court, the Honorable A. Andrew Hauk, United States District Court Judge, presiding.

The law offices of G. Joseph Bertain, Jr., by Timothy H. Fine, Esq., and Simon & Sheridan by James J. Coyle, Esq. and Donald B. Bachrach, Esq. appeared for plaintiffs. Gibson, Dunn & Crutcher, by John J. Hanson, Esq. and Donald L. Zachary, Esq., and William A. Niese, Esq. appeared for defendants, The Times Mirror Company.

Having considered the pleadings, affidavits and memoranda in support of and in opposition to the motion, and having heard the testimony of eight (8) witnesses, and having considered the arguments in support of and in opposition to the motion, and having made Findings of Fact and Conclusions of Law,

It is ordered that the motion of plaintiffs for a preliminary injunction be, and hereby is, denied.