**RUSSELL STOVER CANDIES, INC., Petitioner,**

v.

**FEDERAL TRADE COMMISSION, Respondent.**

No. 82–2036.

United States Court of Appeals, Eighth Circuit.

Submitted April 11, 1983.

Decided Sept. 29, 1983.

Stinson, Mag & Fizzell, Lawrence R. Brown, David E. Everson, Jr., Terence J. Thum, Kansas City, Mo., for petitioner Russell Stover Candies, Inc.

John H. Carley, Gen. Counsel, Howard E. Shapiro, Deputy Gen. Counsel, Ronald A. Bloch, Asst. Director, Bureau of Competition, Nina B. Hale, Washington, D.C., for respondent Federal Trade Commission.

Before LAY, Chief Judge, and McMILLIAN and JOHN R. GIBSON, Circuit Judges.

McMILLIAN, Circuit Judge.

Russell Stover Candies, Inc. petitions for review of a final order of the Federal Trade Commission (Commission) finding that petitioner violated § 1 of the Sherman Act. 15 U.S.C. § 1 (1976). The Commission ruled that petitioner had illegally combined with certain of its retail dealers to fix retail prices. Petitioner and the Commission agree that the continuing vitality of the doctrine announced in *United States v. Col-*

---

disturb the Tax Court's finding that the appellants totally failed to respond to the court's

order to compel discovery.

gate & Co., 250 U.S. 300, 39 S.Ct. 465, 63 L.Ed. 992 (1919), is the sole issue on appeal.[1] For the reasons discussed below, we reverse the order of the Commission.

The facts relevant to this case were stipulated to by the parties. Petitioner is one of at least seven major manufacturers of box chocolates and candies in the United States. Petitioner sells and ships its products to more than 18,000 retailers throughout the country. The retailers are primarily department, drug, card, and gift stores. At issue is petitioner's resale price maintenance policy. As set forth in the following paragraphs from the stipulated facts:

17. Russell Stover designates resale prices for all of its products. Stover communicates those prices to retailers by price lists, invoices, order forms and pre-ticketing all of its products.

18. All Russell Stover retailers are thus aware of the prices designated for each Stover product.

19. Russell Stover announces to each prospective retailer before an initial order is placed that among the circumstances under which Stover will refuse to sell are: whenever Stover reasonably believes that a prospective retailer will resell Stover products at less than designated prices; and whenever an existing retailer has resold Stover products at less than designated prices. These circumstances are widely and generally known to Stover retailers. Stover, however, neither requests nor accepts express assurances from prospective or existing retailers respecting resale prices. Other circumstances under which Russell Stover refuses to sell are not related to resale prices and are not relevant for purposes of this case.

20. Consistent with the announced policy described in paragraph 19, Stover has refused to open retailers which it thought would sell its products at less than designated prices and has ceased selling to existing retailers because they sold Stover products at less than designated prices.

In addition, it was stipulated that a survey revealed that 97.4% of petitioner's products were sold at or above the designated resale price. It was also stipulated that certain retailers would testify that they would have sold petitioner's products at less than the designated resale price but did not do so for fear of termination.

The Commission's complaint charged that petitioner had unlawfully contracted, combined, or conspired with certain of its dealers to fix retail prices, which is a per se violation of § 1 of the Sherman Act. United States v. Socony-Vacuum Oil Co., 310 U.S. 150, 218, 60 S.Ct. 811, 842, 84 L.Ed. 1129 (1940). The basis of the charge was that petitioner designated the resale price for its products, communicated those prices to its retailers, and had an announced policy of terminating those retailers who sold or would sell the products at less than the designated price. Petitioner contested the complaint and the case was referred to an administrative law judge.

The administrative law judge dismissed the complaint because he found that petitioner's actions were unilateral in that there was no evidence of an agreement as is required by § 1 of the Sherman Act.[2] The administrative law judge noted that he was compelled to dismiss the complaint because the case, as presented by a "wittingly incomplete stipulation and a skeletal complaint," fit "within all corners" of the Colgate doctrine. In United States v. Colgate, the Supreme Court held:

The purpose of the Sherman Act is to prohibit monopolies, contracts and combinations which probably would unduly interfere with the free exercise of their rights by those engaged, or who wish to

---

1. "It is clear that complaint counsel framed the proof of their case to require a decision dealing squarely with the meaning of the Colgate doctrine." Decision of the Commission at 8.

2. Section 1 of the Sherman Act provides in part that "[e]very contract, combination in the form of a trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, . . . is declared to be illegal." 15 U.S.C. § 1 (1976).

engage, in trade and commerce—in a word to preserve the right of freedom to trade. In the absence of any purpose to create or maintain a monopoly, the act does not restrict the long recognized right of trader or manufacturer engaged in an entirely private business, freely to exercise his own independent discretion as to parties with whom he will deal. *And of course, he may announce in advance the circumstances under which he will refuse to sell.*

250 U.S. at 307, 39 S.Ct. at 468 (emphasis added).

On appeal the Commission reversed the decision of the administrative law judge. The majority of the Commission held that petitioner had illegally combined with those retailers who "unwillingly complied" with petitioner's designated resale prices. The Commission believed that the essence of a § 1 agreement was coercion and that coercion existed when a retailer's compliance was induced by a manufacturer's announced policy of terminating noncomplying dealers. The Commission concluded that *Colgate* only protected a manufacturer's right to initially select its customers and not to conditioning continued dealing on announced policies. According to the Commission, "the *Colgate* doctrine, as it stands today, does not preclude, as a matter of law, a finding of an agreement when a buyer unwillingly complies with a supplier's pricing policy to avoid termination." [3] Decision of the Commission at 56. Petitioner asserts that the Commission's decision effectively overrules the Supreme Court's holding in *Colgate*. Even the Commission candidly acknowledges that its interpretation of *Colgate* is not free from doubt.

In *United States v. Parke, Davis & Co.,* 362 U.S. 29, 80 S.Ct. 503, 4 L.Ed.2d 505 (1960), the Supreme Court recognized that the *Colgate* decision had created confusion. In an attempt to clarify the meaning of the doctrine, the Court reviewed Supreme Court cases applying *Colgate*[4] and concluded that

whatever uncertainty previously existed as to the scope of the *Colgate* doctrine, [*United States v.*] *Bausch & Lomb* [*Optical Co.,* 321 U.S. 707, 64 S.Ct. 805, 88 L.Ed. 1024 (1944),] and [*Federal Trade Commission v.*] *Beech-Nut* [*Packing Co.,* 257 U.S. 441, 42 S.Ct. 150, 66 L.Ed. 307 (1922),] plainly fashioned its dimensions as meaning no more than that a simple refusal to sell to customers who will not resell at prices suggested by the seller is permissible under the Sherman Act. *In other words, an unlawful combination is not just such as arises from a price maintenance agreement, express or implied; such a combination is also organized if the producer secures adherence to his suggested prices by means which go beyond his mere declination to sell to a customer who will not observe his announced policy.*

362 U.S. at 43, 80 S.Ct. at 511 (emphasis added). In *Parke, Davis,* the Court found that the manufacturer went "far ... beyond the limits of the *Colgate* doctrine," *id.* at 46, 80 S.Ct. at 513, when the manufacturer enlisted "wholesalers' participation in a program to effectuate the retailers' adherence to the suggested resale prices," *id.,* and took "affirmative action to achieve uniform adherence by inducing each customer to adhere to avoid price competition," *id.* at 47, 80 S.Ct. at 513. In *Beech-Nut,* the manufacturer went "beyond" *Colgate* by establishing a policing and reporting system to detect noncomplying dealers and reinstating those dealers only on assurances of future compliance. 257 U.S. at 454, 42 S.Ct.

**3.** The Commission rejected the theory of a vertical-horizontal agreement based on a manufacturer's invitation and retailers' acquiescence in resale prices. *See Interstate Circuit, Inc. v. United States,* 306 U.S. 208, 59 S.Ct. 467, 83 L.Ed. 610 (1939).

**4.** *United States v. Bausch & Lomb Optical Co.,* 321 U.S. 707, 64 S.Ct. 805, 88 L.Ed. 1024 (1944); *Federal Trade Comm'n v. Beech-Nut Packing Co.,* 257 U.S. 441, 42 S.Ct. 150, 66 L.Ed. 307 (1922); *Frey & Son, Inc. v. Cudahy Packing Co.,* 256 U.S. 208, 41 S.Ct. 451, 65 L.Ed. 892 (1921); *United States v. Schrader's Son, Inc.,* 252 U.S. 85, 40 S.Ct. 251, 64 L.Ed. 471 (1920).

at 154. In *Bausch & Lomb,* Soft-Lite, a distributor of optical lenses, was found to have unlawfully combined with its wholesalers because there was more "than mere acquiescence of wholesalers in Soft-Lite's published resale price list. The wholesalers accepted Soft-Lite's proffer of a plan of distribution by cooperating in prices, limitation of sales and approval of retail licensees." 321 U.S. at 723, 64 S.Ct. at 813.

The Commission notes that in vertical restraint cases courts continue to require the existence of "plus factors" to take the case beyond *Colgate.* The Commission believes, however, that the search for "plus factors" is illogical and in fact unnecessary. The Commission's view finds support in commentary critical of *Colgate.* Professor Sullivan has stated:

> Like the *Colgate* doctrine itself, the cases drawing these laborious distinctions between their own facts and those of *Colgate* are infused with anomaly; many of them require nothing which in any realistic sense can be said to enhance the degree of concert involved in the price maintenance; yet, because of some added fact which is logically unrelated to whether or not an agreement is being reached, they hold that the manufacturer has exceeded the scope of the *Colgate* defense.[5]

L. Sullivan, Handbook of the Law of Antitrust 394 (1977). *See also* Levi, *The Parke, Davis-Colgate Doctrine: the Ban on Resale Price Maintenance,* 1960 Sup.Ct.Rev. 258; Turner, *The Definition of Agreement Under the Sherman Act: Conscious Parallelism and Refusals to Deal,* 75 Harv.L.Rev. 655 (1962).

The Commission's view that the presence of "plus factors" is unnecessary also finds

support in dicta in *Albrecht v. Herald Co.,* 390 U.S. 145, 88 S.Ct. 869, 19 L.Ed.2d 998 (1968). In *Albrecht* a newspaper publisher suggested maximum resale prices to its independent newspaper carriers. One carrier charged more than the advertised resale price. The publisher objected and informed the carrier's customers that it could deliver its newspaper at a lower cost than that of the carrier. The publisher then hired an agency to solicit the customers away from the carrier. About 300 out of the carrier's 1,200 customers switched to direct delivery. The publisher then turned these customers, at no cost, over to another independent carrier, who was aware of the situation, and the publisher told the noncomplying carrier that he could have his customers back if he adhered to the designated price. The Supreme Court found that the publisher went "beyond" *Colgate* by hiring the soliciting agency and enlisting the cooperation of the other carrier.

In *Albrecht,* the Court went on to discuss alternative theories of liability. In footnote 6 the Court suggested that "[u]nder *Parke, Davis,* petitioner could have claimed a combination between respondent and himself, at least as of the day he unwillingly complied with respondent's advertised price." 390 U.S. at 150 n. 6, 88 S.Ct. at 871 n. 6. In *Perma Life Mufflers, Inc. v. International Parts Corp.,* 392 U.S. 134, 142, 88 S.Ct. 1981, 1986, 20 L.Ed.2d 982 (1968), the Court cited the "unwilling compliance" language of footnote 6 with approval. It is unclear whether the Court in footnote 6 meant that "unwilling compliance" alone would be enough to support a combination claim or whether the "unwilling compliance" must be induced by coercive tactics, as was the case in *Parke, Davis.*[6]

---

**5.** In *United States v. Parke, Davis & Co.,* 362 U.S. 29, 80 S.Ct. 503, 4 L.Ed.2d 505 (1960), the Supreme Court also recognized the anomaly that *Colgate* had created. The Court stated, "True, there results the same economic effect as is accomplished by a prohibited combination to suppress price competition if each customer, although induced to do so solely by a manufacturer's announced policy, independently decides to observe specified resale prices." *Id.* at 44, 80 S.Ct. at 511. The Court went on, how-

ever, to state that "[s]o long as *Colgate* is not overruled, this result is tolerated but only when it is the consequence of a mere refusal to sell in the exercise of the manufacturer's right " 'freely to exercise his own independent discretion as to parties with whom he will deal.' " *Id.*

**6.** *See Yentsch v. Texaco, Inc.,* 630 F.2d 46, 52–54 (2d Cir.1980) (discussion of footnote 6); *Arnott v. American Oil Co.,* 609 F.2d 873, 885 (8th Cir.1979) (cites footnote 6 in support of a

It may be that footnote 6 in *Albrecht* foreshadows the Supreme Court's overruling of *Colgate* or it may be, as the Commission suggests, that the Court has already confined *Colgate* to willing compliance with suggested prices and to initial customer selection. However, courts continue to cite *Colgate*.[7] As was stated by the Second Circuit in 1960 and applicable today, " '[w]hen a leading case is beset by qualifications and then atrophied by lack of use, its final demise may be difficult to detect. Perhaps the *Colgate* case is dead, despite frequent citation. But doubt remains.' " *George W. Warner & Co. v. Black & Decker Manufacturing Co.*, 277 F.2d 787, 790 (2d Cir.1960) (citation omitted). The Second Circuit further noted that "[t]he Supreme Court has left a narrow channel through which a manufacturer may pass even though the facts would have to be of such Doric simplicity as to be somewhat rare in this day of complex business enterprise." *Id.* In this case, the Commission has presented such a case of "Doric simplicity." There are no "plus factors" to take the case beyond *Colgate.* As noted by the administrative law judge, "the result in this case may have been different had the complaint attacked respondent's actual method of doing business, rather than the stipulated lawyer's construct which has been lovingly nurtured like a hothouse flower, but which has little to do with the real world." Decision of the Administrative Law Judge at 47. If *Colgate* no longer stands for the proposition that a "simple refusal to sell to customers who will not sell at prices suggested by the seller is permissible under the Sherman Act", *United States v. Parke, Davis & Co.*, 362 U.S. at 43, 80 S.Ct. at 511, it is for the Supreme Court, not this court, to so declare.

Accordingly, we reverse the order of the Commission.

combination where a dealer's compliance was induced by a manufacturer's coercive tactics), *cert. denied,* 446 U.S. 918, 100 S.Ct. 1852, 64 L.Ed.2d 272 (1980).

7. *E.g., Filco v. Amana Refrig., Inc.,* 709 F.2d 1257, 1261 (9th Cir.1983) ("[A] manufacturer may announce legally that it will refuse to deal with anyone who does not adhere to its sug-gested price schedule."); *Spray-Rite Serv. Corp. v. Monsanto Corp.,* 684 F.2d 1226, 1234 (7th Cir.1982) ("A manufacturer may unilaterally fix a suggested resale price for its product .... It may also refuse to deal with any distributor that resells the product at a price other than it has suggested."), *cert. granted,* —— U.S. ——, 103 S.Ct. 1249, 75 L.Ed.2d 479 (1983).